UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Robert Moreno Garcia,<br><br>    Plaintiff,<br><br>vs.<br><br>Carolyn W. Colvin, Commissioner of the Social Security Administration,<br><br>    Defendant. | CV 12-0730-TUC-DCB (JR)<br><br>**REPORT AND RECOMMENDATION** |

Plaintiff Robert Moreno Garcia brought this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a final decision by the Commissioner of Social Security denying his claim for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. Plaintiff presents three issues on appeal: (1) whether the Administrative Law Judge ("ALJ") properly evaluated the medical opinions; (2) whether the ALJ properly evaluated Plaintiff's credibility; (3) and whether this case should be remanded for benefits or further proceedings. Pending before the court is an Opening Brief filed by Plaintiff (Doc. 20), the

1

Commissioner's Opposition (Doc. 23), and Plaintiff's Reply Brief (Doc. 24). Based on the pleadings and the administrative record submitted to the Court, the Magistrate Judge recommends that the District Court, after its independent review, affirm the decision of the ALJ.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for disability insurance benefits on February 1, 2010, alleging disability since September 1, 2009. (Administrative Record (AR) 11.) The Social Security Administration denied Plaintiff's application for DIB initially and upon reconsideration. (*Id*.) Plaintiff requested a hearing before an ALJ. (AR 89.) A hearing was held on July 5, 2011. (AR 23-39.) In a decision issued on July 22, 2011, the ALJ concluded that Plaintiff was not disabled within the meaning of the SSA. (AR 11-21.) The Appeals Council denied Plaintiff's request for review of the ALJ's decision. (AR 1-5.) This appeal followed.

## II. FACTUAL HISTORY

### A. Plaintiff's Background

Plaintiff claimed to be disabled beginning September 1, 2009. (AR 11.) He was 56 years old on the date of his application and 58 years old on the date of the decision. (AR 17.) Plaintiff reported he previously worked as a bookkeeper at two different companies and as a counter clerk at a convenience store. (AR 112-16.) He alleged he was disabled due to epilepsy.

B.     **Medical Records**

On October 23, 2009, Plaintiff was enrolled in a clinical trial for refractory partial seizures. (AR 179.) In an office record dated that same day, David J. Teeple, M.D., the doctor in charge of the trial, reported Plaintiff's subjective medical background and noted that Plaintiff reported having seizures from the age of 13 or 14. The seizures were described as three different types. The first was characterized by speech arrest and occured once a week for 2-3 minutes. The second was characterized by "lost time," and although he was not certain, Plaintiff suspected these seizures last from 2-5 minutes. Plaintiff reported the last seizure of this type happened about two weeks prior. The third type of seizure was described as general tonic-clonic seizures that had not happened in many years. His current medications were reported as Carbamazepine and Phenytoin. (AR 157.) In his assessment, Dr. Teeple suspected "localization-related epilepsy, although there are some features of his seizures that are suggestive of a primary generalized epilepsy (lack of postictal manifestations, age of onset)."  (AR 158.)  The doctor recommended further screening and an MRI. (AR 159.)

The findings in an MRI head scan report dated November 25, 2009, were reported as follows:

> There is no evidence of an intracranial mass or hydrocephalus. No definite seizure foci are seen. There are a few scatter foci of increased T2 signal intensity in the white matter of both cerebral hemispheres most likely angiopathic given the patient's age. No abnormal contrast enhancement seen.

3

1  (AR 161.) An electroencephalographic examination ("EEG") the same day was
2  reported as abnormal due to focal slowing in the left temporal region, which was
3  reported as "likely secondary to observed epileptiform discharges, but would
4  correlate with imaging to exclude structural abnormality."  The EEG also showed
5  frequent left temporal epileptiform discharges consistent with a focal epilepsy.  (AR
6  162.)
7       On April 24, 2010, at the request of the ALJ, Plaintiff was seen by James Rau,
8  Ph.D.  (AR 163-170.)  Plaintiff reported to having weekly seizures for the past year.
9  He described the seizures as typically "rather light" and causing him to "pause
10 momentarily."  (AR 164.)  Plaintiff reported that he had difficulty remembering
11 names "at times," but that he remembered day-to-day events and conversations, his
12 concentration was "fine," and he slurred his speech less when he was on
13 anticonvulsant medication.  (AR 164.)  Plaintiff reported that he socialized with his
14 brothers and sisters weekly and described managing his activities of daily living
15 without any difficulty.  (AR 165.)
16      Dr. Rau's intellectual functioning tests showed that Plaintiff functioned
17 overall in the "average" range, but indicated a "left hemisphere inefficiency."  (AR
18 166.)  Dr. Rau noted that Plaintiff did well in his job at Circle K and "doing
19 reasonably well neurocognitively."  (AR 167.)  Dr. Rau diagnosed a cognitive
20 disorder, but stated:
21     that overall his deficits are quite mild and he is not showing any
       uniform impairment nor any uniform borderline deficit functioning
22     either, so he is quite fortunate.

4

(AR 167-168.)  Dr. Rau indicated that he did not feel the cognitive disorder would impose any limitations for 12 months.  (AR 169.)

On May 4, 2010, Dr. Teeple reported in a study record that Plaintiff reported that he was having approximately 2-3 simple partial seizures per month which were characterized by an arrest of speech.  Dr. Teeple reported that throughout the clinical trial, labs and ECGs, Plaintiff was within normal limits.  He also reported some short-term memory impairment and non-fluent aphasia, which caused difficulty in word-finding and naming and caused Plaintiff's speech to be "choppy, interrupted, and awkwardly articulated."  During the course of the study, Plaintiff was removed from Dilantin and Carbamazepine and placed on "a stable dose of lacosamide."  (AR 179.)

In another record from June 8, 2011, Dr. Teeple noted that Plaintiff's "simple partial seizures have increased in frequency" from 2-3 times per month to 9-10 per month.  Plaintiff also reported an increase in complex partial seizures, which involved grimacing, right arm posturing, head movements, and eye deviation.  The seizures were accompanied by a loss of awareness and frequently followed by several hours of lethargy.  (AR 178.)

Later in June 2011, Dr. Teeple completed a Seizure Questionnaire for Treating Physicians, wherein he noted that Plaintiff's seizures occurred on average twice weekly, but recently had increased to 9-10 times per month.  He indicated that Plaintiff had one to four hours of lethargy after a seizure, which included fatigue,

5

weakness, sleepiness, depression, anxiety, and anger.  Dr. Teeple stated that Plaintiff could not drive at all and that he would be absent from work for six to eight days per month due to seizures.

      **C.**      **Hearing Testimony**

            **1.**      **Plaintiff's Testimony**

At the July 5, 2011, hearing, Plaintiff was represented by counsel and testified that he was unmarried and had no children and had a bachelor's degree in forestry and political science. (AR 26-27.) He lives with his sister and her son at his sister's house. His sister drove him to the hearing and although he has a driver's license, he uses it only for identification. (AR 27.) His only income is $200 month in food stamps. (AR 28.)

He last worked in June or July 2009 as a clerk at Circle K. He left that job after suffering a seizure. A customer called 911 and although he had recuperated by the time paramedics arrived, his manager began watching him closely and eventually fired him because "in their interpretation because of my minor seizures or heavy seizures I had been violating safety rules." (AR 28.) He subsequently sought other employment, but could not find anything. Before working at Circle K, Plaintiff worked as a bookkeeper for two companies, one of which he partly owned. (AR 29-30.) That worked required him to work on a computer. (AR 30.)

When asked why he could no longer work as a bookkeeper, Plaintiff explained that he had a problem with seizures that can occur four or five times per week and leave him feeling "almost like coming out of a coma . . . ." (AR 31.) The seizures

6

1  began when he was in high school.  (AR 35.)  He explains that he is unable to
2  determine precisely how many seizures he has because he has no idea when it is
3  happening.  (AR 32.)  He indicated that he had lost several teeth in seizure-related
4  falls (*id.*), and that the seizures caused muscle cramps and fatigue.  (AR 37.)

5  When asked why there were no treatment notes, the Plaintiff and his counsel
6  explained that the Plaintiff was participating in a study program through the
7  neuroscience center.  The study involved a proprietary drug (Lacosamide) and
8  treatment notes were unavailable because it was a testing program.  (AR 34.)
9  Plaintiff stated that he had previously been on Dilantin and Carbamazepine.  (AR 34-
10 35.)

11 **D.      ALJ's Decision**

12 The ALJ found that Plaintiff had severe impairment of epilepsy.  (AR 13.)
13 The ALJ found that the Plaintiff had the RFC to perform a full range of work at all
14 exertional levels, but was limited to simple and unskilled jobs.  (AR 13.)  The ALJ
15 then found that "considering the [Plaintiff's] age, education, work experience, and
16 residual functional capacity, there are jobs that exist in significant numbers in the
17 national economy that the [Plaintiff] can perform."  (AR 17.)  The ALJ therefore
18 concluded that the Plaintiff was not disabled.  (AR 18.)

19 **III.    STANDARD OF REVIEW**

20 For purposes of Social Security benefits determinations, a disability is defined
21 as:

22

7

>The inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

20 C.F.R. § 404.1505.

Whether a claimant is disabled is determined using a five-step evaluation process. It is claimant's burden to show (1) he has not worked since the alleged disability onset date, (2) he has a severe physical or mental impairment, and (3) the impairment meets or equals a listed impairment or (4) his residual functional capacity ("RFC") precludes him from doing his past work. If at any step the Commission determines that a claimant is or is not disabled, the inquiry ends. If the claimant satisfies his burden though step four, the burden shifts to the Commissioner to show at step five that the claimant has the RFC to perform other work that exists in substantial numbers in the national economy. *See* 20 C.F.R. § 404.1520(a)(4)(i)-(v).

In this case, Plaintiff was denied at step five of the evaluation process. The step five determination is made on the basis of four factors: the claimant's RFC, age, education, and work experience. *Hoopai v. Astrue*, 499 F.3d 1071, 1074 (9th Cir.2007). The Commissioner can meet his burden at Step Five "through the testimony of a vocational expert or by reference to the Medical Vocation Guidelines." *Thomas v. Barnhart*, 278 F.3d 947, 955 (9th Cir.2002); 20 C.F.R. pt. 404, subpt. P, app.2 (the "grids").

The ALJ's decision to deny disability benefits will be vacated "only if it is not supported by substantial evidence or is based on legal error." *Robbins v. Soc. Sec.*

1  *Admin.*, 466 F.3d 880, 882 (9th Cir.2006).  "'Substantial evidence' means more than a
2  mere scintilla, but less than a preponderance, i.e., such relevant evidence as a
3  reasonable mind might accept as adequate to support a conclusion."  *Id*.  Substantial
4  evidence is "such relevant evidence as a reasonable mind might accept as adequate to
5  support a conclusion."  *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir.1997).  In
6  evaluating whether the decision is supported by substantial evidence, the Court must
7  consider the record as a whole, weighing both the evidence that supports the decision
8  and the evidence that detracts from it.  *Reddick v. Chater*, 157 F.3d 715, 720 (9th
9  Cir.1998); *see* 42 U.S.C. § 405(g) ("findings of the Commissioner of Social Security
10 as to any fact, if supported by substantial evidence, shall be conclusive").  If there is
11 sufficient evidence to support the Commissioner's determination, the Court cannot
12 substitute its own determination.  *See Young v. Sullivan*, 911 F.2d 180, 184 (9th
13 Cir.1990).

## IV.   DISCUSSION

### A.   Evaluation of Dr. Teeple's Opinions

"The ALJ must consider all medical opinion evidence."  *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cri.2008); *see* 20 C.F.R. § 404.1527(d); SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996).  "[T]he ALJ may only reject a treating or examining physician's uncontradicted medical opinion based on 'clear and convincing' reasons."  *Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1164 (9th Cir.2008) (citing *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir.1995)).  Where a treating physician's opinion is contradicted, it may be rejected for specific and

legitimate reasons that are supported by substantial evidence in the record. *Carmickle*, 533 F.3d at 1164 (citing *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983)). "The ALJ can 'meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir.2002). "The opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record." *Id*.

In his decision, the ALJ provided legitimate reasons supported by the record for refusing to give Dr. Teeples' opinion controlling weight. The ALJ first thoroughly summarized Dr. Teeples' brief records and Dr. Rau's examination report. (AR 14-15.) The ALJ then proceeded to note that Dr. Teeple furnished little documentation of the medication administered to the study group and no treatment records that would support a finding of disability. Plaintiff does not dispute that there were no medical records, but blames that fact on the inability of Dr. Teeples to provide the records because they are "proprietary." This lack of records is a sufficient basis for the ALJ to reject Dr. Teeples' medical opinion because it is "unsupported by the record as a whole." *Batson v. Comm'r of the Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2003).

Additionally, no medical provider has indicated seeing Plaintiff have a seizure and the clinical studies performed show either no evidence of seizure (MRI) or only contain limited indications (EEG). Thus, the ALJ properly discounted Dr. Teeples'

10

1  records because they were largely premised on Plaintiff's self-reports of seizures and
2  were not supported by objective evidence. *Meanel v. Apfel*¸172 F.3d 1111, 1113-14
3  (9th Cir. 1999); *Lester*, 81 F.3d at 831; *see also Morgan v. Comm'r of Soc. Sec.*
4  *Admin.*, 169 F.3d 595, 602 (9th Cir. 1999) (when physician's opinion of disability
5  premised "to a large extent" upon claimant's own accounts of symptoms, limitations
6  may be disregarded if complaints have been "properly discounted").

7        The ALJ also properly discounted Dr. Teeples' opinions by relying on the
8  examination records of Dr. Rau.  Dr. Rau concluded that "overall [Plaintiff's] deficits
9  are quite mild and he is not showing any uniform impairment nor any uniform
10 borderline deficit functioning either, so he is quite fortunate."  (AR 167-168.)  This
11 statement constitutes the sort of specific and legitimate reason supported by
12 substantial evidence that would allow the ALJ to reject the opinion of a treating
13 physician. *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005); *Tonapetyan v.*
14 *Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (ALJ can favor opinion conflicting with
15 that of a treating physician where treating physician's opinion is conclusory, brief,
16 and unsupported by clinical findings).

17     **B.**     **Plaintiff's Credibility**

18       The Plaintiff criticizes the ALJ for discrediting his testimony by relying on
19 "the numerous activities he performs on a regular basis." *Opening Brief,* p. 5.  In the
20 Decision, the ALJ noted that the Plaintiff reported walking daily for forty or forty-
21 five minutes, sitting in a public park, doing household chores, and actively
22 volunteering.  The ALJ found these activities inconsistent with total disability.  (AR

16.) Contrary to Plaintiff's assertion, this was entirely appropriate. *See Morgan v. Commissioner*, 169 F.3d 595, 600 (9th Cir. 1999) (ability "to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting" can be used to discredit a plaintiff).

The adverse credibility finding is also supported by the ALJ's evaluation of the medical record. Assessing a plaintiff's testimony regarding the severity of his impairments depends on the medical evidence. *See Chaudhry v. Astrue*, 688 F.3d 661, 670 (9th Cir.2012) ("Because the RFC determination must take into account the claimant's testimony regarding his capability, the ALJ must assess that testimony in conjunction with the medical evidence."). As discussed above, the medical evidence supported the ALJ's refusal to find Plaintiff disabled based on Dr. Teeple's records. That same evaluation applies to the evaluation of Plaintiff's testimony. Considered in tandem, the ALJ's findings that Plaintiff's activities of daily living and the lack of objective medical evidence of disability undermined his credibility are clear and convincing because they were supported by "findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit [the Plaintiff's] testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) (citations omitted). As such, the ALJ properly discounted Plaintiff's subjective complaints.

V.     **RECOMMENDATION**

For the foregoing reasons, the Magistrate Judge **recommends** the District Court, after its independent review, enter an order **affirming** the decision of the Commissioner and denying benefits.

1  This Recommendation is not an order that is immediately appealable to the
2  Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to Rule 4(a)(1),
3  Federal Rules of Appellate Procedure, should not be filed until entry of the District
4  Court's judgment.

5  However, the parties shall have fourteen (14) days from the date of service of
6  a copy of this recommendation within which to file specific written objections with
7  the District Court.  *See* 28 U.S.C. § 636(b)(1) and Rules 72(b), 6(a) and 6(e) of the
8  Federal Rules of Civil Procedure.  Thereafter, the parties have fourteen (14) days
9  within which to file a response to the objections.  If any objections are filed, this
10  action should be designated case number: **CV 12-730-TUC-DCB**.  Failure to timely
11  file objections to any factual or legal determination of the Magistrate Judge may be
12  considered a waiver of a party's right to *de novo* consideration of the issues.  *See*
13  *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir.2003)(*en banc*).

14  Dated this 25th day of July, 2013.

_____
Jacqueline M. Rateau
United States Magistrate Judge